LEIGH M. CLARK, Retired Circuit Judge.
Appellant was tried on an indictment that charged, inter alia, that he “did unlawfully take or attempt to take immoral, improper or indecent liberties with . a female child under the age of sixteen years . . The omission herein of other language contained in the indictment, including the name of the alleged victim, is of no detriment to appellant, we think, and may be a contribution to the victim’s future welfare. The indictment charged a crime defined and denounced by Code of Ala.Re-comp.1958, Tit. 14, Chap. 51B, § 326(2) and Code 1975, § 13-1-113. In accordance with the maximum punishment fixed by law, the court sentenced him to imprisonment for five years. Appellant does not challenge the sufficiency of the evidence to support the verdict, and we see no reasonable basis for such challenge. A recital of essential evidence as to the details of the crime would serve no useful purpose.
Defendant, in a written statement signed by him, almost a year after the alleged crime, confessed to it and to another incident like it with the same victim, and expressed a sense of nausea and remorse by reason of his conduct.
The confession of defendant became a target of his defense in a pre-trial motion to suppress. The motion was not heard until the State called and identified, as a witness for the State, Mr. Larry Waldrop, a criminal investigator for the Cullman County Sheriff’s office, to whom defendant made the confession. As soon as Mr. Waldrop was identified and it became apparent that the State planned to offer the confession or other statements by. defendant in evidence, the jury was excused, and the State proceeded with Mr. Waldrop to lay a predicate for the admission in evidence of the conversation between Mr. Waldrop and defendant, and the written confession made by him. In lengthy testimony, the witness said that before any statement was made by defendant, defendant was not offered any reward or hope of reward or any inducement to make a statement. He showed that before making a statement, defendant had been advised fully as to his right to remain silent, as well as his right to a lawyer at the expense of the State. He fully covered the field of the requirements set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and all of the pre-Miranda requirements preliminary to the admission of a confession or incriminating statement. He further showed that defendant, in effect, acknowledged orally and in writing that he had been fully apprised of his rights, that his statements and confession were voluntary and made of defendant’s “own free will without promise or hope of reward, without fear or threat of physical harm, without coercion, favor or offer of favor, without leniency or offer of leniency, by any person or persons whomsoever.”
Appellant does not question the sufficiency of the evidence to show the voluntariness of the confession other than as stated in his brief as follows:
“. . . However, two important points about the circumstances surrounding the confession were brought out on cross-examination of Detective Waldrop. First, it was revealed that Detective Wal-drop is related to the defendant by marriage (R. 68) a factor which would certainly increase the trust which the defendant had in the officer. Secondly, it was revealed that while talking to the defendant before he gave the confession, Detective Waldrop told the defendant that he was going to get him some help, (R. 72) and that he did not remember, but he could have told the defendant specifically that he would help him when the case came to trial. (R. 75).”
Appellant does not argue his first point. It could well be that relation by consanguinity or affinity between a defendant and an officer to whom a confession is made would have a bearing on the question of voluntariness and other requisites for the *564 admission into evidence of a confession, but if voluntariness and all of the other requirements are shown, the relation between the two as shown here is not of itself an obstacle to the admission in evidence of the confession. As appellant does not amplify in any way the first point as quoted above, we think it appropriate for us not to amplify what we say on the point.
As to appellant’s second point, we quote from portions of the testimony of Detective Waldrop relied upon by appellant:
“Q A couple of minutes, and he made the corrections on the thing and signed the statement. How long, now, during the time that you were talking to him, you told him you were going to get him some help, is that correct?
“A I did.
“Q How many times did you tell him you were going to help him?
“A Once.
“Q Did you tell him you would help him up here in the court?
“A I don’t have the power to help anybody up here.
“Q I understand that, you told him you would help him didn’t you?
“A If I did I don’t remember it.
“Q You could have said that, is that correct?
“A Again, if I did I don’t remember it. “Q I am asking you, Larry, you could have said it, you don’t remember it? “A It is possible, yes.
“Q It is possible that that could have been said?
“A Yes.
“Q You wouldn’t deny it if he said that you did say it, you wouldn’t deny it, would you?
“A Mr. Gorham, I wouldn’t lie on the witness stand if they turned everybody here loose.
“Q I’m trying to find out, Larry, what was said down there before the statement.
“A No, sir, I would not deny it.
“Q You would not deny it?
“A No, sir.
“Q Then, what you are saying is that the statement could have been made, you don’t remember it?
“A I don’t remember it.
On redirect examination of the witness, he testified as follows:
“Q Mr. Waldrop, when he was asking you about — he asked you to help him, was that at the time, were you talking about his mental condition, mental situation? “A Yes, sir, we were.
“Q And help him get to see — who is the man that you said you got a call to get in touch with him?
“A Bill Thornton, the Mental Health worker.
“Q When you said you would help him, that is what you did, help him get some mental health treatment?
“A It is, yes, sir.
“Q You called Mr. Thornton, did you get an appointment with him or what happened?
“A I had my secretary call him, they said he was out. I believe they said he would call when he came in and sometime later he came in and interviewed Mr. Slaten.
“Q He asked you to do that?
“A Yes, sir.
“Q What did he talk about, his mental condition at that time, were you and he discussing his mental condition at that time?
“A Yes.
Then on recross-examination, the witness testified:
“Q You used the words I’ll help you, didn’t you, when you were talking to him, I’ll help you out?
“A No, sir, I told him that if he did do this something was wrong with him, I would get him some help.
*565 “Q All right. Now, the help that you are talking about, you don’t know what he understood, do you?
“A I told him I would tell Bill Thornton of the Mental Health Department, I told him I would get him over there.
“Q You also told him you would help him, is that correct, Larry.
“A Yes, sir, that is correct.
“Q And then you talked about the Mental Health Clinic, is that correct?
“A No, sir, we were talking about the Mental Health Clinic when we were talking about helping him.
“Q Did you ever say these words, I will help you, if you will tell me what happened?
“A No, sir.
“Q All right. What you are saying is that you never told him that you would help him in any way with this case? “A I did not indicate that I would help him in court, no.
“Q You did not indicate that you would help him?
“A I did not tell him.
“Q You told him you would — you have already testified to that, you told him that you would help him?
“A Yes, sir.”
It is contended by appellee in its brief: “Appellee submits that the offer of mental treatment was a mere collateral benefit and not one to produce in the mind of the Defendant any hope of favor.”
If by this appellee means that the offer of a collateral benefit is never sufficient to constitute such an offer of benefit that would invalidate as involuntary the confession of an accused, we cannot agree. Any such thought should be dispelled by what was recently said by the Alabama Supreme Court in Holt v. State, Ala., rev’g Holt v. State, Ala.Cr.App. (1978). The Supreme Court held that the admissibility of a confession is not to be determined by any distinction between the offer or promise of a “collateral” benefit and the offer or promise of a “direct” benefit. Any confession induced by the promise or offer of a “collateral” benefit lacks voluntariness as much as a confession induced by the offer or promise of a “direct” benefit.
We must take all of the circumstances as to the confession into consideration. The testimony of the officer may have lacked, to some extent, desirable precision and positiveness, particularly when made in answer to double-barrel questions, not conducive to a meeting of the minds of the questioner and the answerer. Even so, we are favorably impressed with the forthrightness of the witness, with his obvious efforts to state the unvarnished facts. We are convinced from his testimony as a whole, which is the only testimony for or against appellant on the point under consideration, that the only thing said by him that could be construed as an offer or promise to help pertained to his statement to the effect that he would ask or tell Mr. Bill Thornton of the Mental Health Department to confer with defendant. We are convinced that his statement to defendant did not constitute any offer or promise conditioned upon the incriminating statement or confession. We have no reason to discount the following in his testimony:
“Q You used the words I’ll help you, didn’t you, when you were talking to him, I’ll help you out?
“A No, sir, I told him that if he did do this something was wrong with him. I would get him some help.
“Q All right. Now, the help that you were talking about, you don’t know what he understood, do you?
“A I told him I would tell Bill Thornton of the Mental Health Department, I told him I would get him over there.
“Q You also told him you would help him, is that correct, Larry?
“A Yes, sir, that is correct.
“Q And then you talked about the Mental Health Clinic, is that correct?
“A No, sir, we were talking about the Mental Health Clinic when we were talking about helping him.
“Q Did you ever say these words, I will help you, if you will tell me what happened?
*566 “A No, sir.”
Notwithstanding the persistence of defendant’s able counsel in asking the witness as to the possibility of the witness’ having made a statement to defendant in addition to what the witness remembered that he said and the concession by the witness of such possibility, there is no substantial premise upon which to base a reasonable conclusion that any such unremembered statement was made.
The facts pertaining to the question of the admissibility in evidence of the confession in the instant case are clearly distinguishable from the facts that necessitated a reversal in Womack v. State, 281 Ala. 499, 205 So.2d 579 (1967), relied upon by appellant. In the cited case there was evidence by defendant that the officer, a sheriff, had told defendant that “it would go lighter” for him if he “told them about it.” The officer did not deny that he made such statement to defendant. Upon being questioned thereon, he frankly admitted, “I could have.” This left undisputed evidence in the case that the officer had made an offer or promise calculated to induce the confession of the defendant.
We are convinced that it cannot be reasonably found from the evidence that Officer Waldrop made any promise or offer to defendant calculated to induce him to make a confession. We are also convinced that there is no reasonable basis in the evidence for a conclusion that anything said or implied by Officer Waldrop served as an inducement to defendant to make the confession. The confession met all of the requirements as to voluntariness. Speaking to the requirement of voluntariness, it has been stated:
“If from a review of the surrounding circumstances it appears that an extrajudicial confession has not been induced by a threat or a promise, express or implied, operating to produce in the mind of the prisoner apprehension of harm or hope of favor, then such confession is admissible as evidence. Guenther v. State, 282 Ala. 620, 213 So.2d 679.” Bass v. State, 55 Ala.App. 5, 312 So.2d 576 (1975).
Appellant makes a special point as to the admissibility of the confession by saying that “Detective Waldrop knew at the time that the defendant was under severe emotional strain, and made no effort whatsoever to explain to the defendant his rights,” and contends “that under all the circumstances the State has failed to show that he made a knowing and intelligent waiver of his Miranda rights.” We do not understand that appellant takes the position that Detective Waldrop failed to inform defendant fully as to his constitutional rights or to warn him as to the consequences of a waiver of his rights, particularly his right against self-incrimination and his right to counsel, at the expense of the State, but suggests that in view of the condition of defendant at the time of the confession, which appellant describes as a “severe emotional strain” to the knowledge of Detective Waldrop, the officer should have done more than is usually required as a predicate to the admission in evidence of a confession.
In our opinion, taking all the circumstances into consideration, the statements made to defendant, the reading of the information and warnings contained in the Miranda card, as contained in the record, the reading by defendant of a printed acknowledgment that he signed, in which he stated that he had “been advised and duly warned by” Detective Waldrop of all of such rights, the evidence was sufficient to convince the trial court that the officer did “explain to the defendant his rights.”
There is nothing in the record to indicate that any physical, mental or emotional condition of defendant made him incapable of an understanding of his rights or of intelligently and knowingly waiving them. The abnormality of the particular crime demonstrates the abnormality of the one committing it, but we are convinced that he was physically, mentally and emotionally capable of fully understanding his rights, that he did understand them and that the waiver by him of them was knowingly and intelligently made by him.
*567 One of the witnesses testifying against defendant was the victim of the crime. She was nine years and one month old at the time of her testimony. Appellant urges that she was an incompetent witness because she did not understand the nature of an oath or affirmation.
“(a) Persons who have not the use of reason, such as idiots, lunatics during lunacy, and children who do not understand the nature of an oath, are incompetent witnesses.
“(b) The court must, by examination, decide upon the capacity of one alleged to be incompetent from idiocy, lunacy, insanity, drunkenness or infancy.” Ala. Code 1975, § 12-21-165
Immediately upon call of the witness, the trial judge, very appropriately in view of her immaturity, spoke to her, told her where she should be seated and asked her her age. Without then attempting to administer to her the oath of a witness, he continued appropriately to ask her preliminary questions as to her family, her school, whether she went to Sunday school and church, and some questions as to her knowledge of the Bible. The questions of the court and answers of the one called as a witness continue as follows:
“Q . do you know what happens to people from a religious standpoint that would tell a story an untruth, tell a lie?
“A Yes.
“Q What happens to them, from a [Bjible standpoint, do you know if that is good or bad to tell a story?
“A Bad.
“Q [Name], do you know what it means, I want to put you under oath to tell the truth, to swear to tell the truth, do you understand what that means that you are obligated to tell us the truth, do you understand that?
“MR. GORHAM: Let the record reflect that she said no to that other question. “THE COURT: And she said yes to the last one.
“Q Do you understand what it means [Her Name], I want to swear you to tell the truth?
“MR. GORHAM: Let the record reflect that she said no.
“THE COURT: Do you know what that means, that means I want to, in a moment, for you to raise your right hand and I want you to affirm or swear that you will tell us, all of us the truth to questions that the lawyers may ask you, do you understand that?
“MR. GORHAM: Let the record reflect that she doesn’t understand that, she said no.
“THE COURT: If I swear you, [Her name], you are obligated to tell the truth here, can you do that, you will do that? Is someone making you nervous, particularly, maybe it is me, in my loud suit.
“I want you to stand up and raise your right hand and I want to put you under oath. [Her name], you swear the statements you make here will be the truth so help you God, speak up, now, say yes, for the record, will you? Will you speak the truth, tell us the truth?
“A (Witness nodding head).
“MR. GORHAM: May I start objecting now?
“THE COURT: If you will, stand over there, I would appreciate it.
“MR. GORHAM: She is looking at her mother.
“THE COURT: I have been trying to get her relaxed.
“MR. GORHAM: I ask that she be placed under the rule and again, because of the circumstances here I ask again that her mother be placed out of the courtroom during her testimony.
“THE COURT: Because of her age and the nature of the proceedings here I am going to deny your motion.
“MR. GORHAM: Because of her age and nature of these proceedings I don’t think she is qualified — .
“THE COURT: The Court has ruled on that motion, the motion denied, go ahead, Mr. Bland.
“MR. GORHAM: I except. Are you denying me the right to stand between her and her mother?
*568 “THE COURT: I am not denying you the rights, I am asking you to get back so he can ask questions, I am not going to let him stand between you and the witness, Mr. Bland.
“MR. BLAND: For the convenience of asking of this witness, may I stand over there, closer to her?
“THE COURT: Don’t stand in between each other. You can stand up here if he is going to stand over there.
“I direct traffic in the courtroom.”
Thereafter, the proceedings continued with reasonable placidity for an extended series of questions and answers of the witness until questioning came to the immediate circumstances of the alleged crime. It appears from the record that at that time the witness became unresponsive to questions asked her by counsel for the State and by the trial judge. It is indicated by the record that during that time, and, in fact, during most, if not all, of the time, from the commencement of her testimony, counsel for the State and counsel for defendant were standing and moving around; the witness’ mother was seated at the table of counsel for the State; defendant was, of course, seated at the table of his counsel, and in front of the witness had been placed a microphone into which she had been directed to talk and with which she was not familiar. Her subsequent testimony disclosed that after the crime defendant had threatened to kill her if she told about it. Before any testimony by the witness as to the crime, the court declared a recess for the express purpose of allowing her to be questioned by counsel for the State out of the courtroom, but in the presence of her mother and others. After the recess of five minutes, she testified readily as to the crime committed by defendant.[1]
On cross-examination, the witness was asked what her mother told her at the recess, and the witness answered that her mother told her to tell the truth.
Irrespective of who was chiefly at fault in the matter of the witness’ not responding to questions as to the crime itself until after the recess, we are persuaded that the fault was not entirely that of the witness, and we are not convinced by such fact that the witness was incompetent.
The principle to be applied is succinctly stated in Gamble, McElroy’s Alabama Evidence § 94.02(3) (1977):
“Whether a child is qualified to take a witness’ oath is a matter that is lodged necessarily in the discretion of the trial court because, among other things, the trial court has the opportunity of observing the manner and appearance of the child while being examined, an opportunity which the appellate court does not have.”
“Kendrick v. State, 52 Ala.App. 230, 291 So.2d 165 (1974) (holding that seven-year old witness was qualified and of sufficient age and mental maturity to understand and appreciate binding effect of oath; citing McElroy); Rodgers v. State, 42 Ala.App. 660, 177 So.2d 460, cert. denied, 278 Ala. 712, 177 So.2d 464 (1965) (admitting testimony of daughter, almost 14 years old, with whom defendant was charged with having carnal knowledge); Horsley v. State, 42 Ala.App. 567, 1972 [172] So.2d 56 (1965) (accepting girl who was between seven and eight years old as competent witness in trial of her father for allegedly abusing her in attempt to carnally know her); see herein § 94.-01(5).” Id. n. 4
We can hardly imagine a case in which it would be more difficult for an appellate court to visualize with satisfaction the courtroom scene in plain view of the trial judge. We hold that the trial court was not in error in holding that the witness was competent to testify.
Even though not necessary, we note that there was strong evidence, in addition to the confession of defendant and the testimony of the victim, that tended to show defendant’s guilt of the crime charged.
*569 We find no error in the record prejudicial to appellant. The judgment appealed from should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article (Constitutional Amendment No. 328). His opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
All the Judges concur.

. The specific act was fellatio.